IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Allena Chenelle Blackwell, | ) | C/A No.: 1:19-1781-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Mary Geiger Lewis, United States District Judge, dated June 24, 2019, referring this matter for disposition. [ECF No. 8]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 7].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income

---

[1] Andrew M. Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), Saul is substituted for Nancy A. Berryhill.

("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.      Relevant Background

A.      Procedural History

On May 23, 2016, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on September 1, 2012. Tr. at 215–20, 221–27. Her applications were denied initially and upon reconsideration. Tr. at 125–29, 136–39, 140–43. On April 16, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Peter Jamison. Tr. at 48–70 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 5, 2018, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–38. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–8. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 21, 2019. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 51 years old at the time of the hearing. Tr. at 55. She completed high school. *Id.* Her past relevant work ("PRW") was as a packager. Tr. at 65. She alleges she has been unable to work since September 1, 2012. Tr. at 61.

2.     Medical and Educational History

Plaintiff's school records reflect a history of placement in resource classes. Tr. at 309. On testing administered in April 1979, Plaintiff obtained a verbal intelligence quote ("IQ") score of 74, a non-verbal IQ score of 69, and full-scale IQ score of 68.[2] Tr. at 305. However, it appears Plaintiff graduated from high school with a diploma. *See* Tr. at 307–08 (providing a check mark in the "unit column indicates course earns a certificate unit instead of a diploma unit" and reflecting numbers, as opposed to check marks, in the unit columns, completion of 21.5 credit units, and a graduation date).

On September 17, 2012, Plaintiff presented to Carmine Fiorentino, M.D. ("Dr. Fiorintino"), for prescription refills. Tr. at 425. She complained of depression and acute worsening of chronic right-sided lumbar pain. *Id.* Dr.

---

[2] Plaintiff's IQ scores are recorded in her school records, but the record lacks detail as to the type of test administered and Plaintiff's efforts on testing. *See* Tr. at 305. As the record contains only one IQ score report, it is unclear whether this score is consistent with any other scores obtained while Plaintiff was enrolled in school.

Fiorentino noted no abnormalities on exam. Tr. at 426. She assessed pain in lower leg joint, unspecified essential hypertension, generalized osteoarthrosis involving multiple sites, and lumbago. *Id.* She prescribed Coreg and Tribenzor for hypertension, Roxicodone and Zanaflex for generalized osteoarthrosis, and Xanax, Bentyl, and Cymbalta for mental health complaints. *Id.* She discontinued Percocet. *Id.*

On October 15, 2012, Plaintiff reported increased anxiety following a car accident. Tr. at 428. She requested medication refills. *Id.* Dr. Fiorentino noted no abnormalities on exam, aside from elevated blood pressure. Tr. at 429. She prescribed Coreg, Benicar, and Amlodipine Besylate for hypertension, Roxicodone and Zanaflex for generalized osteoarthrosis, and Xanax, Bentyl, Cymbalta, and Seroquel XR for mental health complaints. *Id.* She discontinued Tribenzor. *Id.*

Plaintiff presented to Andrea T. Moore, M.A. ("Ms. Moore"), for an initial clinical assessment on November 14, 2012. Tr. at 340. She complained of severe panic attacks and hearing voices calling her name. *Id.* She reported a history of sexual abuse and cutting herself and endorsed nightmares and fleeting suicidal and homicidal ideation. *Id.* Ms. Moore noted no abnormal findings on mental status exam, aside from Plaintiff's reports of auditory hallucinations, sleeping at short intervals, experiencing nightmares, and having decreased appetite, energy level, and libido. Tr. at 342–43. She

assessed depressive disorder, not otherwise specified ("NOS"), alcohol dependence, and cannabis abuse by history and indicated a global assessment of functioning ("GAF")[3] score of 55.[4] Tr. at 343. She recommended Plaintiff engage in limited outpatient services. Tr. at 344.

On November 26, 2012, Plaintiff complained of acute worsening of right-sided lumbar pain and requested medication refills. Tr. at 430. Her blood pressure was elevated, but Dr. Fiorentino noted no other abnormalities on exam. Tr. at 431. She increased Benicar HCT to 40-25 mg and refilled Plaintiff's other medications. *Id.*

Plaintiff requested medication refills on December 20, 2012. Tr. at 433. Dr. Fiorentino noted no abnormalities on exam. Tr. at 434. She refilled Plaintiff's medications and provided samples of Seroquel and Cymbalta. Tr. at 433, 434.

Plaintiff presented to psychiatrist Eula H. Pate ("Dr. Pate"), on January 23, 2013. Tr. at 338. She reported having few friends and stated she

[3] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. *American Psychiatric Association: Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition, Text Revision.* Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[4] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or coworkers)." *DSM-IV-TR.*

had not been the same since her mother's death four years prior. *Id.* Dr. Pate noted Plaintiff looked older than her age and had poor coping skills. *Id.* She assessed depressive disorder, NOS, as well as passive and dependent traits and a GAF score of 60. Tr. at 338–39.

On February 22, 2013, Plaintiff requested Dr. Fiorentino refill prescriptions for Xanax and Roxicodone. Tr. at 436. Plaintiff's blood pressure was elevated, but Dr. Fiorentino noted no other abnormalities on exam. Tr. at 437. She discontinued Cymbalta and refilled Plaintiff's other medications. *Id.*

Plaintiff followed up with Dr. Fiorentino for medication refills on March 28, 2013. Tr. at 438. Her weight had increased to 212 pounds with a body mass index ("BMI") of 35.27, but Dr. Fiorentino noted no other abnormalities on exam. Tr. at 439. Plaintiff reported she was not taking Amlodipine, and Dr. Fiorentino discontinued the medication and refilled Coreg, Benicar, Roxicodone, Zanaflex, and Xanax. *Id.*

Plaintiff reported seizures, low blood pressure, fast heart rate, and increased depression on May 10, 2013. Tr. at 440. Dr. Fiorentino discontinued Coreg and refilled Benicar, Zanaflex, Roxicodone, and Xanax. Tr. at 441.

On May 14, 2013, Dr. Pate noted Plaintiff appeared older, weathered, and cognitively impaired. Tr. at 336. She suspected Plaintiff was experiencing orthostatic hypotension at night and indicated she needed to speak to Dr. Fiorentino because her prescribing Xanax 2 mg might be the

source of the problem. *Id.* Dr. Pate noted limited judgment and insight, dull sensorium and mood and congruent affect, and distractible thought process on mental status exam. Tr. at 336–37. She assessed depressive disorder, NOS, as well as passive and dependent traits and a GAF score of 65.[5] Tr. at 337.

On June 17, 2013, Plaintiff denied recent seizures, but complained of respiratory symptoms and feeling "really tired." Tr. at 443. Dr. Fiorentino refilled Roxicodone, Zanaflex, and Seroquel. Tr. at 444.

On July 22, 2013, Plaintiff complained of increased stress and requested financial assistance in obtaining her medications. Tr. at 446. Her weight had increased to 225 pounds. Tr. at 447. Dr. Fiorentino noted no other abnormalities. *Id.* She refilled Roxicodone and Zanaflex and continued Plaintiff's other medications. *Id.* Plaintiff requested Seroquel, as it was less expensive than Seroquel XR, and Dr. Fiorentino prescribed it. *Id.*

On October 1, 2013, Dr. Fiorentino observed a papular rash over Plaintiff's trunk, face, and neck. Tr. at 450. She refilled Roxicodone and Zanaflex and prescribed Prednisone for the rash. *Id.*

---

[5] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *DSM-IV-TR.*

On October 25, 2013, Dr. Pate noted Plaintiff was sad because her boyfriend was incarcerated. Tr. at 334. She indicated Plaintiff's memory was "not as good as it should be" and her insight and judgment were limited by her disorders and IQ. *Id.* She noted no other abnormalities on mental status exam, assessing depressive disorder, NOS and a GAF score of 60. Tr. at 334–35.

Plaintiff presented to Dr. Fiorentino with concerns over her blood pressure and the cost of her medications on October 31, 2013. Tr. at 452. Dr. Fiorentino indicated Plaintiff's hypertension had improved since her last visit. *Id.* Plaintiff weighed 228.5 pounds, but Dr. Fiorentino noted no other abnormalities on exam. Tr. at 454. Dr. Fiorentino discontinued Benicar, as Plaintiff could no longer afford it, and prescribed Tribenzor again. *Id.* She discontinued Roxicodone and prescribed Hydrocodone-Acetaminophen 10-325 mg, as it cost less. *Id.* She discontinued Bentyl because Plaintiff indicated it was ineffective. *Id.*

On December 12, 2013, Plaintiff reported impaired balance, but denied blurred eyesight and headaches. Tr. at 456. She indicated her blood pressure had been running low. *Id.* On exam, Plaintiff's blood pressure was 120/83 mm/Hg and she weighed 223.5 pounds. Tr. at 458. Dr. Fiorentino assessed acute upper respiratory and ear infections and prescribed Bactrim DS,

Prednisone, and Cortisporin Otic Suspension. Tr. at 458. She refilled Xanax. Tr. at 459.

On January 27, 2014, Plaintiff indicated she had been unable to visit Dr. Pate and had not obtained her mental health medications. Tr. at 460. Dr. Fiorentino authorized medication refills. Tr. at 462.

Plaintiff presented to Robin L. Moody, Ph.D. ("Dr. Moody"), for a consultative clinical evaluation on February 18, 2014. Tr. at 349–55. Dr. Moody noted Plaintiff was over an hour late to the appointment, as she reported difficulty finding the location. Tr. at 349. Plaintiff was accompanied by her aunt. *Id.* She reported a history of anxiety that began in childhood and sexual abuse that occurred from ages eight to 12. Tr. at 350. She endorsed increased depression and anxiety following her mother's death four years prior. *Id.* She indicated she had developed seizures after her boyfriend shot and killed a man outside a motel in Florida. *Id.* Plaintiff endorsed erratic sleep, weight gain, poor appetite, variable energy, and occasional auditory hallucinations. *Id.* She denied a history of suicide attempts. *Id.* She reported some learning problems, but indicated she obtained a high school diploma. Tr. at 351.

Plaintiff reported she lived with her two aunts and uncle and spent most days lying in bed. Tr. at 351–52. She indicated she sometimes walked to the church to visit her mother's grave. Tr. at 352. She admitted she had a

driver's license and retained abilities to drive, complete light chores, cook, prepare her own meals, shop alone, manage funds, maintain a bank account, bathe and dress herself with difficulty, and watch movies. *Id.*

Dr. Moody observed Plaintiff to appear much older than her stated age and to ambulate with a slow and waddling gait. *Id.* She noted Plaintiff's speech was slow and clear. *Id.* She described Plaintiff's affect as "flat for the most part," her mood as depressed, her thought process as concrete, and her attitude as complaint. *Id.* She stated Plaintiff showed no evidence of hallucinations or delusions. *Id.* She indicated Plaintiff's memory and concentration appeared poor and her judgment and insight were difficult to assess. *Id.*

Dr. Moody indicated Plaintiff scored 17 of 30 on the Mini-Mental State Exam 2 ("MMSE-2"); identified two of three items for immediate recall; identified no items on delayed recall; declined to attempt serial seven calculations; failed to properly repeat a phrase; failed to follow a command; wrote a simple sentence; and failed to draw conjoining pentagons. *Id.* Dr. Moody stated results of the assessment were questionable because Plaintiff did not attempt serial sevens. *Id.* She indicated Plaintiff showed inconsistent motivation and put forth questionable effort. Tr. at 353.

Dr. Moody administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), and Plaintiff obtained the following IQ scores: 63 on

verbal comprehension, 69 on perceptual reasoning, 55 on working memory, 62 on processing speed, and 57 on full scale. *Id.* She stated results were "questionable given her inconsistent self reported history and effort." *Id.*

Dr. Moody administered the Wide Range Achievement Test–Fourth Edition ("WRAT–4"), and Plaintiff achieved the following grade-level equivalencies: 2.8 for word reading, 2.8 for sentence comprehension, 2.4 for spelling, and 2.4 for math computation. Tr. at 354. Plaintiff's reading composite score was "[v]ery [d]eficient." *Id.* Dr. Moody indicated results of the assessment were "questionable given her inconsistent statements regarding her history." *Id.*

Dr. Moody concluded Plaintiff "was a rather suspicious reporter." *Id.* She indicated "most of [Plaintiff's] statements were contradictory." *Id.* However, she opined "[n]onetheless, her presentation was rather consistent with an individual who had learning disabilities as evidenced by her speech content." *Id.* She stated Plaintiff's "ability to maintain attention and concentration is within the extremely low range as is her ability to process routine visual information without making errors." Tr. at 355. She wrote the following:

> Although test results and her presentation suggest she is cognitively impaired her history of consistent employment, ability to drive a car, having a high school diploma, and managing a bank account are rather puzzling. Again, she showed rather inconsistent effort during testing and malingering is questionable as are her cognitive limitations. A rule out of Malingering is

suggested and a rule out of Mild Mental Retardation. As for her emotional symptoms, a diagnosis is deferred at the moment although panic disorder should be considered.

*Id.*

Dr. Moody addressed Plaintiff's abilities to perform activities of daily living ("ADLs"), engage in social functioning, manage funds, and maintain concentration, persistence, or pace. *Id.* She indicated Plaintiff's ADLs included using a cell phone and calculator, driving a car, bathing and dressing, and completing light chores, but noted she typically stayed in bed and deferred to others. *Id.* She noted Plaintiff typically socialized with those in her household and one close friend, but was not involved with organized groups and did not attend parties or social activities. *Id.* She stated Plaintiff's concentration, persistence, and pace appeared limited and her ability to carry out simple instructions was questionable. *Id.* She was unable to determine if Plaintiff was malingering or capable of managing her own funds. *Id.*

On February 17, 2014, Plaintiff reported she had not recently seen Dr. Pate. Tr. at 464. She indicated her next appointment was scheduled for March. *Id.* Her blood pressure was 105/68 mm/Hg and she weighed 226 pounds. Tr. at 466. Dr. Fiorentino prescribed Dilaudid 4 mg for lumbago. *Id.*

Plaintiff was admitted to Oconee Medical Center on February 24, 2014, for a change in mental status. Tr. at 360. She had two episodes of vomiting in the emergency room, and a computed tomography ("CT") scan of her abdomen

showed acute cholecystitis. *Id.* Her right ankle was swollen, and she reported having fallen two weeks prior. Tr. at 376. Laboratory results were positive for elevated white blood cell count, elevated liver enzymes, and elevated glucose, and a drug screen was positive for opioids. Tr. at 361. Osceola P. Gilbert, M.D. ("Dr. Gilbert"), described Plaintiff as having a flat affect and just staring at her as she talked. Tr. at 365. Plaintiff received intravenous antibiotics and started Levemir and sliding-scale insulin. Tr. at 368. She consulted with an orthopedist, who placed her in a boot for a nondisplaced malleolus fracture. *Id.* Christian E. Singleton, M.D. ("Dr. Singleton"), conducted a mental health evaluation on February 27, 2014. Tr. at 374. He described Plaintiff as having a withdrawn attitude during interview, flat affect, depressed mood, monotone and quiet speech, and blocking thought process. *Id.* He indicated Plaintiff presented no evidence of delusions, acknowledged and understood her problems, was usually able to make sound decisions, and was alert and oriented to person, place, time, and situation. *Id.* He opined that Plaintiff's major depressive disorder ("MDD") was possibly compounded by some of the medication she was being prescribed for pain. *Id.* He stated "[i]t appears that she may lack the emotional intelligence to cope with grief and stress effectively. *Id.* Plaintiff's mental status improved and her symptoms resolved with antibiotic therapy. Tr. at 368. She was discharged on February 28, 2014, with diagnoses of acute calculus

cholecystitis, acute encephalopathy, elevated liver function tests, diabetes, depression, psychiatric illness, seizure disorder, and closed fracture of the lateral malleolus. Tr. at 367. Matthew Robison, D.O. ("Dr. Robison"), instructed her to follow up with a general surgeon for gallbladder removal surgery in four-to-six weeks. Tr. at 368. He noted "[d]isposition is somewhat concerning as the patient does have significant mental health issues, which may impede her care." Tr. at 369.

Anderson-Oconee-Pickens Mental Health Center discharged Plaintiff on April 22, 2014, based on her noncompliance with treatment. Tr. at 417. Plaintiff missed several appointments prior to being discharged. *Id.*

On October 16, 2014, Plaintiff complained of concerns over seizures, diabetes, and hyperlipidemia. Tr. at 468. Her blood pressure was slightly elevated at 151/92 mm/Hg, but Dr. Fiorentino noted no abnormalities on exam. Tr. at 470. Dr. Fiorentino prescribed Seroquel 200 mg and Clonazepam, 1 mg. *Id.*

On October 28, 2014, Plaintiff complained of fever and followed up for hypertension and medication refills. Tr. at 472. Her blood pressure was elevated at 161/104 mm/Hg and she weighed 222 pounds. Tr. at 474. Dr. Fiorentino noted no abnormalities on general exam. *Id.* She refilled Plaintiff's medications. *Id.*

Plaintiff presented to A. Nicholas DePace, Ph.D. ("Dr. DePace"), for a consultative mental status exam on February 25, 2015. Tr. at 476–79. She reported she had moved in with another of her aunts during the prior year because that aunt was better able to assist her in managing her seizures. Tr. at 476. She endorsed a history of learning problems while enrolled in school, but indicated she completed high school with a diploma. *Id.* She indicated she had worked for eight years as a machine operator in a plastics plant prior to being laid off in 2011 or 2012 because of her erratic behavior. Tr. at 476–77. Plaintiff reported she would spend the day in bed if she had a headache. Tr. at 477. She indicated she would spend time with her aunt, go outside, or watch television if she felt okay. *Id.* She endorsed abilities to perform chores, cook, manage her own funds, use Facebook, access the internet from her phone, perform personal hygiene, and drive, prior to having her driving restricted due to seizures. *Id.*

Dr. DePace observed Plaintiff to appear much older than her actual age, to be casually dressed and appropriately groomed, to be alert and oriented in all spheres, to be aware of current events, to demonstrate normal psychomotor behaviors, to walk without an assistive device, to demonstrate normal speech, to have fairly full affect and self-described "okay" mood, to show coherent and goal-directed thought processes, and to likely be functioning in the low-average intellectual range. Tr. at 477–78. Plaintiff

denied perceptual disturbances, paranoia, and homicidal and suicidal ideation. Tr. at 478. Dr. DePace described Plaintiff as cooperative and indicated she maintained good eye contact. *Id.* He stated Plaintiff was able to follow directions without significant difficulty. *Id.* He indicated Plaintiff showed no evidence of significant tearfulness, fearfulness, anger, anxiety, or sadness. *Id.*

Dr. DePace stated the full-scale IQ score of 57 obtained by Dr. Moody was inconsistent with "[Plaintiff's] presentation here today." *Id.* His diagnostic impressions were "consider prescription medication misuse (opiates and benzodiazepines), consider conversion disorder, and consider fabrication and/or exaggeration of seizures and/or other optional problems." *Id.* He indicated "[c]ognitively, I do believe the claimant is able to function effectively and perform all higher-order activities of daily living if she chooses to do so." *Id.* He opined that Plaintiff was "likely functioning in at least the Low Average range." Tr. at 478–79. He further stated he did not believe Plaintiff was "experiencing significant negative affect at [the] time." Tr. at 479. He believed Plaintiff was capable of performing three-step commands. *Id.*

Plaintiff presented to John Dewey Hynes, M.D. ("Dr. Hynes"), for a consultative orthopedic exam on April 16, 2015. Tr. at 481–85. Plaintiff reported bilateral ankle pain with a history of congenital defects, left-sided

hip pain, rheumatoid arthritis, seizures, depression, panic attacks, anxiety, gallbladder problems, and hypertension. Tr. at 481–82. Dr. Hynes reviewed x-rays of the lumbar spine that showed some L5–S1 facet hypertrophy and mild degenerative changes, but well-maintained disc heights throughout the lumbar spine. Tr. at 482. He indicated x-rays of Plaintiff's left knee showed mild degenerative changes with slight loss of medial joint space. *Id.* He stated x-rays of Plaintiff's left hip showed femoral calcifications and a maintained left hip joint. *Id.* Plaintiff was 5'5" tall and weighed 195 pounds. Tr. at 483. Her blood pressure was slightly elevated at 152/84 mm/Hg. *Id.* Dr. Hynes described Plaintiff as alert, but somewhat tangential in her speech and a poor historian. *Id.* He noted Plaintiff required some redirecting. *Id.* He observed Plaintiff's left ankle to be more swollen than the right and painful to palpation. *Id.* He indicated Plaintiff's left ankle range of motion ("ROM") was restricted to 30 degrees of dorsiflexion and 20 degrees of plantar flexion. *Id.* He stated Plaintiff's right ankle was mildly tender to palpation, but demonstrated normal ROM. *Id.* He noted 2+ pitting edema to the right mid-tibia and 3+ pitting edema to the left mid-tibia. *Id.* He observed normal ROM of Plaintiff's knees. *Id.* Plaintiff endorsed mild hip pain to palpation, but demonstrated full ROM of the hips. *Id.* She demonstrated normal ROM of the wrists and elbows. *Id.* Dr. Hynes noted normal grip strength and normal fine and gross manipulation. *Id.* He observed limited forward flexion and

abduction of the right shoulder to 100 degrees, but full ROM to adduction and internal and external rotation. *Id.* He indicated Plaintiff's left shoulder abduction and forward elevation were limited to 110 degrees, but she had full ROM to adduction and internal and external rotation. Tr. at 484. Plaintiff demonstrated full ROM of the cervical spine. *Id.* She was able to flex her lumbar spine to 70 degrees and demonstrated full ROM to extension and lateral flexion. *Id.* A straight-leg raising ("SLR") test was negative bilaterally in the seated and supine positions. *Id.* Plaintiff was able to squat to 80 degrees, but endorsed low back pain. *Id.* She indicated balance problems prevented her from performing tandem walk. *Id.* She had 5/5 motor strength in her upper and lower extremities. *Id.* She demonstrated no evidence of muscular atrophy and had brisk reflexes. *Id.* A sensory exam was normal in the upper extremities, but Plaintiff had decreased sensation to pinprick in the left lateral thigh. *Id.* Dr. Hynes observed Plaintiff to ambulate with a shuffling gait, favoring the left ankle and with her right foot slightly deviated outwardly. *Id.* He noted Plaintiff used no assistive device to ambulate. *Id.* He assessed walking problems/ankle pain, left hip pain, rheumatoid arthritis, seizure disorder, psychiatric problem, gallbladder problems, and hypertension. Tr. at 484–85. He indicated he was not certain as to a diagnosis related to Plaintiff's ankle and foot. Tr. at 484. He stated x-rays and exam of Plaintiff's left hip revealed no clear etiology for left hip pain. *Id.* He indicated

Plaintiff's left ankle, which had recently undergone acute trauma, was her only markedly swollen and tender joint. *Id.* He noted Plaintiff appeared to be somewhat tangential in her speech, but communicated adequately. Tr. at 485. He stated Plaintiff's blood pressure was fairly well controlled on medication. *Id.*

On July 23, 2015, Plaintiff presented to Ezra Ash, M.D. ("Dr. Ash"), to establish treatment. Tr. at 495–98. She reported a history of diabetes, hypertension, seizures, and rheumatoid arthritis. Tr. at 495. Dr. Ash noted no tenderness to palpation of the lumbar spine, normal lumbar ROM, and negative bilateral SLR testing. Tr. at 496. He observed normal ROM of all joints in the bilateral upper and lower extremities and no joint swelling. *Id.* A neurological exam showed no abnormalities. Tr. at 497. Plaintiff endorsed symptoms of depression. *Id.* Her glucose was elevated at 259 mg/dL, and Dr. Ash ordered administration of insulin. *Id.* Dr. Ash refilled Plaintiff's medications and ordered lab work. Tr. at 498.

Plaintiff presented to Tabitha J. Garner, APRN ("NP Garner"), on August 4, 2015. Tr. at 499. NP Garner noted no abnormalities on physical exam. *Id.* Plaintiff's glucose was again elevated at 232 mg/dL and her hemoglobin A1c was high at 8.0%, but both were decreased from the prior visit. Tr. at 499–500. NP Garner instructed Plaintiff to use Glipizide daily and to remain compliant with diet. Tr. at 500. She prescribed Lopid 600 mg

for hypertriglyceridemia and vitamin D for deficiency. *Id.* She instructed Plaintiff to refrain from taking Tylenol and using alcohol for three months because of elevated aspartate aminotransferase, alanine aminotransferase, and alkaline phosphatase. *Id.*

On August 24, 2015, Plaintiff complained of insomnia. Tr. at 502. Kadijah Jones, M.D. ("Dr. Jones"), prescribed Klonopin 1 mg. Tr. at 503.

Plaintiff complained of increased indigestion and pain in her bilateral hips and knees on September 8, 2015. Tr. at 504. Her blood pressure and seizures were controlled and her glucose, sleep, and mood were improved. *Id.* Lauren E. Golden, APRN ("NP Golden"), indicated no abnormalities on examination of Plaintiff's hips and knees, except her complaints of pain with motion. Tr. at 505. She described Plaintiff's mood as calm, normal, non-depressed, and reasonably positive. Tr. at 506. She prescribed Meloxicam for joint pain. *Id.*

Plaintiff presented to Tonna Coleman, PA-C ("PA Coleman"), for medication refills on October 27, 2015. Tr. at 508. PA Coleman noted no abnormalities on exam, and Plaintiff's glucose had improved. Tr. at 508–09.

Plaintiff returned to Dr. Fiorentino on December 2, 2015. Tr. at 562. Dr. Fiorentino noted no abnormalities on exam. Tr. at 564. She refilled Hydrocodone-Acetaminophen and increased Klonopin to two milligrams. *Id.*

On May 24, 2016, Plaintiff's blood pressure was elevated at 150/87 mm/Hg and her weight had increased to 229.5 pounds. Tr. at 568. Dr. Fiorentino noted no other abnormalities on exam. *Id.* She discontinued Zanaflex, Celexa, Simvastatin, and Depakote ER and prescribed Baclofen 10 mg, Prozac 20 mg, Lovastatin 20 mg, and Depokote 250 mg. Tr. at 568–69.

Plaintiff presented to Jeffery C. Ford, M.D. ("Dr. Ford"), for a consultative examination on August 2, 2016. Tr. at 571–76. She complained of panic attacks occurring as often as three times per week; depression characterized by fatigue, crying, and variable sleep; seizures occurring as often as twice a week; fallen arches that caused difficulty standing and walking; and diabetes. Tr. at 571. She reported abilities to lift and carry five pounds for five minutes at a time, to stand for 15 minutes prior to resting for 15 minutes, to sit for two minutes without shifting, to walk for 20 minutes prior to resting for 20 minutes, and to climb stairs and ascend ramps. Tr. at 571–72. She denied requiring a cane to ambulate and endorsed abilities to reach overhead with both arms and to operate foot controls with both feet. *Id.* She complained of poor balance and indicated she was unable to stoop, crouch, kneel, crawl, or climb ladders or scaffolds. Tr. at 572. She stated she was able to shop for herself, travel without a companion, walk at least a block on rough or uneven surfaces, use public transportation, climb a few steps at a

reasonable pace, prepare simple meals, dress, bathe, groom, get in and out of a bathtub, sort and use paper and files, and drive. *Id.*

Dr. Ford noted Plaintiff weighed 235 pounds. Tr. at 573. He stated she had no difficulty moving from the seated to the supine or standing positions. *Id.* He observed no muscle wasting or tenderness and no joint deformity. Tr. at 574. He indicated Plaintiff could squat half-way down and had bilateral pes planus. *Id.* He recorded normal findings on ROM testing. *Compare* Tr. at 574 (reflecting Plaintiff's ROM during exam), *with* Tr. at 489 (indicating normal ROM measurements). Dr. Ford described Plaintiff as alert, oriented, and able to follow instructions. *Id.* He noted Plaintiff had no sharp/dull discrimination in her bilateral lower extremities and no vibratory sensation in the left lower extremity, but that sensation to light touch was intact. *Id.* He indicated Plaintiff had normal deep tendon reflexes. *Id.* He described Plaintiff as having a waddling gait and being unable to tandem walk because of poor balance. *Id.* He stated Plaintiff had intact fine and gross manipulation. Tr. at 574–75. Dr. Ford noted Plaintiff was able to recall zero of three objects on memory testing. Tr. at 575. He observed 5/5 motor strength in all areas testing. *Id.* He stated Plaintiff's affect was flat or sad, her insight appeared good, and her speech was normal. *Id.* He summarized Plaintiff's impairments as anxiety, depression, claim of seizures without corroborating evidence, diabetes, hypertension, hypercholesterolemia, foot

pain, pes planus, migraines, irritable bowel syndrome, degenerative joint disease, and neuropathy, per record. *Id.*

On August 12, 2016, state agency consultant Rebekah Jackson, Ph.D. ("Dr. Jackson"), reviewed the record and completed a psychiatric review technique. Tr. at 74–76, 85–87. She considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, 12.07 for somatoform disorders, and 12.08 for personality disorders and assessed no repeated episodes of decompensation and a mild degree of limitation as to restriction of ADLs, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. *Id.* She concluded Plaintiff's impairments were "not severe" and caused "no more than mild limitations on" functioning. Tr. at 76, 87. A second state agency consultant, Anna P. Williams, Ph.D. ("Dr. Williams"), reviewed the evidence and provided the same opinion on November 29, 2016. *Compare* Tr. at 74–76, 85–87, *with* Tr. at 101–02, 114–15.

On August 15, 2016, state agency medical consultant James Taylor, DO ("Dr. Taylor"), reviewed the record and assessed the following physical residual functional capacity ("RFC"): occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climbing ladders/ropes/scaffolds; occasionally

climbing ramps/stairs and balancing; frequently stooping, kneeling, crouching, and crawling; and avoiding all exposure to hazards. Tr. at 77–79, 88–90. Ronald Collins, M.D. ("Dr. Collins"), assessed the same physical RFC on November 28, 2016. *Compare* Tr. at 77–79, 88–90, *with* Tr. at 103–06, 116–19.

On September 22, 2016, Plaintiff presented to Lexington Medical Center for right upper quadrant pain. Tr. at 605. An ultrasound of her gallbladder showed cholelithiasis, hepatomegaly hepatic steatosis, and no right hydronephrosis. Tr. at 580–81.

Plaintiff presented to Roland R. Craft, M.D. ("Dr. Craft"), for a gallbladder consultation on October 17, 2016. Tr. at 582. She complained of intermittent and persistent epigastric and right upper quadrant discomfort associated with nausea and vomiting. *Id.* Dr. Craft noted no abnormalities on exam. Tr. at 584. He recommended Plaintiff undergo laparoscopic cholecystectomy and performed the surgery the following day. Tr. at 584–85, 588–90.

Plaintiff followed up with Dr. Craft for a postoperative visit and drain removal on October 24, 2016. Dr. Craft indicated Plaintiff's postoperative course was unremarkable and removed the drain. Tr. at 595–96.

Plaintiff presented to Dr. Craft for a three-week postoperative visit on November 7, 2016. Tr. at 597. She complained of postprandial diarrhea,

abdominal discomfort, and fever. *Id.* Her weight had decreased to 211.8 pounds. *Id.* Dr. Craft noted no abnormalities on exam. *Id.* He prescribed WelChol for diarrhea and ordered an abdominal CT scan and lab work. Tr. at 598.

Plaintiff followed up with PA Coleman regarding hypertension, diabetes, seizures, gastroesophageal reflux disease ("GERD"), and depression on November 15, 2016. Tr. at 654. PA Coleman described Plaintiff as well-developed, obese, ambulating normally, and being active and alert with normal mood. *Id.* She refilled Plaintiff's medications. Tr. at 654–55.

Plaintiff presented to Lexington Mental Health ("LMH") for an initial clinical evaluation on January 20, 2017. Tr. at 677. She endorsed depression, trouble sleeping, hearing voices, and seizures with panic attacks. Tr. at 684. She reported a history of methamphetamine abuse, but denied current use. *Id.* She followed up for further assessment on February 3, 2017. Tr. at 679–82. Deana Caldwell, MS, LPC-I ("Counselor Caldwell"), observed the following on mental status exam: neat and clean appearance and hygiene; appropriate motor activity; cooperative attitude; blunted and tearful affect; hopeless, passive, and depressed mood; normal rate and tone of speech; normal, appropriate, coherent, and relevant thought process; ideas of hopelessness; auditory hallucination of someone calling her name; alert to person, place, time, and situation; poor decision making that adversely affects

self; acknowledges, but fails to understand problems; poor recent memory; able to do simple math; and below average fund of knowledge. Tr. at 681–82. She assessed MDD, recurrent episode, with psychotic features, as well as panic disorder. Tr. at 682. Counselor Caldwell stated the following:

> [Plaintiff] is not forthcoming with information and requires prompts and multiple related questions to fully answer assessment items. There may also be some neurological damage from all the seizures as she reports having memory problems and struggled to comprehend some of the questions. [Plaintiff] doesn't want to be depressed but also doesn't have any goals or desires for her life. It seems as if she is not confident that her situation can change for the better and that she can be happy.

*Id.*

Plaintiff followed up with Counselor Caldwell on February 7, 2017. Tr. at 686. She reported poor self-esteem. *Id.* Counselor Caldwell observed Plaintiff as presenting with a blunted affect and euthymic mood. *Id.* She recommended Plaintiff focus treatment on improving her self-esteem and being able to emotionally connect with others. Tr. at 687.

On February 24, 2017, Plaintiff complained of multiple stressors, including feeling controlled by the aunt with whom she lived and fearing she would need to return to another aunt's and uncle's house to care for them. Tr. at 705. She reported thoughts of cutting herself to relieve stress, but agreed to engage in positive stress-relieving activities like exercising at the gym instead. *Id.* Counselor Caldwell described Plaintiff as presenting with a

blunted affect, monotone voice, and melancholy demeanor. *Id.* She encouraged Plaintiff to work on coping methods to manage symptoms. *Id.*

Plaintiff contacted LMH's after-hours emergency line on March 27, 2017, to report increased depression, suicidal ideation, and a recent incident in which had intentionally gouged her arm with a needle. Tr. at 703. She complained her medication was ineffective and indicated she was dealing with increased family stressors following a family member's death. *Id.* She indicated she had missed her last appointment because of the death in her family. *Id.* She agreed not to harm herself and to present for an emergency services visit the following morning. *Id.*

Plaintiff presented to John L. Safko, Jr., M. Ed. ("Mr. Safko"), at LMH on March 28, 2017. Tr. at 701. She reported increased symptoms and indicated her medications were ineffective. *Id.* She indicated an aunt had recently passed away and her uncle was staying with her, causing increased stress. *Id.* Mr. Safko discussed with Plaintiff options for her to assist her uncle in obtaining assistance to return to his own home. *Id.* He described Plaintiff as appearing anxious with a blunted affect. *Id.* He stated Plaintiff's speech and eye contact were normal. *Id.*

On March 31, 2017, Plaintiff had a flat affect and became tearful during the counseling session. Tr. at 699. She complained she felt hopeless and overwhelmed. *Id.* She denied cutting herself, but admitted she had

intentionally scraped her arm. *Id.* She described conflict with her aunt, who complained about her visits to the gym. *Id.* Counselor Caldwell encouraged Plaintiff to engage in painting and drawing as positive outlets to relieve stress. *Id.*

Plaintiff also presented to Fransetta Sterling, M.D. ("Dr. Sterling"), for medical assessment during the visit. Tr. at 713. She complained of increased depression following an aunt's death two weeks prior. *Id.* Dr. Sterling noted the following findings on mental status exam: normal appearance; cooperative attitude; calm behavior; normal eye contact; normal speech; intact associations; linear thought process; denies suicidal and homicidal ideation, delusions, hallucinations, and obsessions; depressed mood; appropriate affect; alert sensorium; oriented to time, person, place, and circumstance; intact recent and remote memory, attention, and concentration; average language; and poor insight and judgment. Tr. at 714. He diagnosed mild, recurrent MDD and panic disorder. *Id.* He prescribed Prazosin 1 mg, Cogentin 0.5 mg, Seroquel 300 mg, and Cymbalta 20 mg and provided medication samples. *Id.*

On April 3, 2017, Plaintiff was upset because her friend had attempted suicide over the weekend. Tr. at 698. Counselor Caldwell described Plaintiff as presenting with anger, low mood, and blunted affect. *Id.* Plaintiff complained of frustration with her family members, who she felt had placed

obligations on her that prevented her from pursuing her own happiness. *Id.* Counselor Caldwell encouraged Plaintiff to use coping methods and to attempt to change her outlook. *Id.*

Counselor Caldwell described Plaintiff as presenting with a blunted affect on May 15, 2017. Tr. at 696. Plaintiff expressed her frustration with her aunt and uncle, who attempted to control her activities. *Id.* Counselor Caldwell encouraged Plaintiff to focus on stress-relieving activities. *Id.*

On June 5, 2017, Counselor Caldwell described Plaintiff as "better groomed and well-dressed." Tr. at 695. She stated Plaintiff's mood and demeanor continued to be melancholy. *Id.* Plaintiff complained of feeling stressed over providing care to her elderly aunt and uncle. *Id.* However, she indicated her daily visits to the gym provided some relief. *Id.*

On June 19, 2017, Counselor Caldwell described Plaintiff as having a blunted affect and a somber expression. Tr. at 694. Plaintiff described conflict with her aunt, but indicated she was addressing it by listening to music in her room, going to the gym daily, and walking in the community. *Id.* She expressed frustration over her role as caregiver for her elderly relatives. *Id.* Counselor Caldwell encouraged Plaintiff to continue to work on relieving stress and increasing her confidence. *Id.* She stated Plaintiff was "managing her mood well despite the constant stress of caregiving, being controlled and

going without one of her medications for over a month due to some type of error." *Id.*

Plaintiff presented to Ginavra C. Gibson, LPC-I ("Counselor Gibson"), on July 10, 2017. Tr. at 693. She reported low self-esteem with little improvement. *Id.* However, she admitted she was doing little to try to improve her self-esteem. *Id.* She stated she had stopped going to the gym because her aunt did not like her leaving the house and would yell at her when she returned. *Id.* Counselor Gibson encouraged Plaintiff to work on activities to boost her self-esteem. *Id.*

Plaintiff also presented to Dr. Sterling for medication monitoring during the visit. Tr. at 711. She complained of nightmares and requested Prazosin be refilled. *Id.* She reported "okay" mood and poor appetite. *Id.* She indicated she spent most of her days in the gym and cooking meals. *Id.* Dr. Sterling noted the following on mental status exam: normal appearance; cooperative attitude; calm behavior; normal eye contact; normal speech; intact associations; linear thought process; denies delusions, obsessions, and hallucinations; denies suicidal and homicidal ideation; "okay" and appropriate affect; alert sensorium; oriented to time, place, person, and circumstance; intact recent and remote memory; intact attention and concentration; average language; and poor judgment and insight. *Id.* He diagnosed MDD, panic disorder, and posttraumatic stress disorder ("PTSD").

Tr. at 712. He prescribed Prazosin 1 mg, Cogentin 0.5 mg, Cymbalta 30 mg, Seroquel 300 mg, and Prozac 40 mg. *Id.*

On July 28, 2017, Plaintiff complained of anger and indicated her medication was not working. Tr. at 709. She reported depressed mood and poor sleep and appetite. *Id.* Dr. Sterling noted the following on mental status exam: normal appearance; cooperative attitude; normal eye contact; normal and articulate speech; intact associations; denies delusions, obsessions, and hallucinations; denies suicidal and homicidal ideation; affect appropriate, but "not that good"; intact sensorium; oriented to time, place, person, and circumstance; intact recent and remote memory, attention, and concentration; average language; and poor judgment and insight. *Id.* He diagnosed MDD and panic disorder. *Id.* He prescribed Seroquel 300 mg, Cogentin 0.5 mg, Prozac 40 mg, Trazodone 150 mg, Cymbalta 40 mg, and Prazosin 1 mg. Tr. at 710.

On September 1, 2017, Counselor Gibson noted Plaintiff presented with a depressed mood and flat affect, but was appropriately dressed and oriented to time, place, person, and situation. Tr. at 692. Plaintiff complained that her aunt's efforts to control her actions caused her stress. *Id.* She was looking forward to a weeklong trip to the beach without her aunt. *Id.* She indicated she was no longer struggling with self-esteem and desired to focus on

improving her mood and energy level by getting out of the house and socializing more often. *Id.*

Plaintiff presented to Melinda Thiam, M.D. ("Dr. Thiam"), for medication monitoring on November 2, 2017. Tr. at 706–08. Dr. Thiam noted Plaintiff was using Klonopin as needed to prevent seizures, as she would take the medication if she felt a seizure coming on. Tr. at 706. She indicated Klonopin had last been filled in March, and Plaintiff had been rationing the medication. *Id.* Plaintiff endorsed depression and was tearful and despondent. *Id.* She felt her medications were not working. *Id.* Dr. Thiam observed mild tremor with movement and some periods of minor myoclonus in the upper and lower extremities. *Id.* She described Plaintiff's eye contact as downcast and nearly tearful. *Id.* She indicated Plaintiff's speech was slow and she had delayed latency. *Id.* She noted Plaintiff's mood was depressed and anxious and her affect was constricted. *Id.* She stated Plaintiff had a normal appearance, cooperative attitude, intact associations, logical/goal-directed thought process, intact attention and concentration, good judgment, average fund of knowledge, was oriented times four, and denied hallucinations, obsessions, delusions, and homicidal and suicidal ideation. *Id.* She diagnosed MDD, PTSD, and psychological factors affecting other medical conditions. Tr. at 706–07. She prescribed Lamotrigine 25 mg, Lamictal 100 mg, Lamictal 200 mg, Duloxetine 40 mg, Prazosin 2 mg, Seroquel 300 mg,

Trazodone 150 mg, and Diazepam 10 mg. Tr. at 707. She instructed Plaintiff to gradually increase her dose of Lamictal until she reached a dose of 200 mg on week seven. *Id.*

On December 7, 2017, Counselor Gibson described Plaintiff as appropriately dressed and oriented to time, place, person, and situation. Tr. at 690. She indicated Plaintiff had a calm mood and flat affect. *Id.* Plaintiff reported she had a new boyfriend, but indicated her aunt was very controlling and did not approve of her spending time outside the home. *Id.* She planned to improve her mood and energy level by socializing outside her home at least twice a week. *Id.*

On February 9, 2018, Counselor Gibson provided a letter supporting Plaintiff's claim for disability benefits. Tr. at 716. She indicated Plaintiff's diagnoses included MDD, panic disorder, and PTSD. *Id.* She stated:

> In my clinical opinion, [Plaintiff] would have difficulty maintaining employment due to symptoms of her mental illnesses. Per our observation and [Plaintiff's] feedback, she has difficulty with maintaining mood stability; she had difficulty with interacting with others due to uncontrollable sadness and anxiety, she has difficulty with focus, physical fatigue, and the ability to complete tasks. In my opinion, it is likely that it will be very difficult for [Plaintiff] to maintain gainful employment for the foreseeable future.

*Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing, Plaintiff testified as to her age and schooling. Tr. at 55.
She testified that she worked for Parkway Products for nine or ten years,
providing break relief and running machines. *Id.* She said she stopped
working in 2012, after her employer found her actions to be abnormal. *Id.* She
said she had not worked or applied for work since 2012. *Id.* She said she could
read, but was limited to simple words. Tr. at 56–57. She stated her seizure
disorder was under reasonable control so long as she took her medication. Tr.
at 57. She said she was severely depressed and had received mental health
treatment. *Id.* She described herself as manic depressive, feeling like doing
things on some days and doing nothing on other days. *Id.*  She admitted to
sticking herself with a needle, having suicidal thoughts, and having
nightmares about dead people each night. Tr. at 57–58. She stated she had
never been married, did not have children, and had never lived alone. Tr. at
58. She said she lived with her aunt. *Id.*

Plaintiff described anxiety that made her feel nervous and experience
panic attacks, triggered by drastic things. Tr. at 58–59. She said she did not
deal well with being required to do something quickly because her mind
would start to spin. Tr. at 59. She described her panic attacks as affecting her

breathing. *Id.* She said she drove three times a week to the grocery store. *Id.* She said she could not concentrate and would lose track of her thoughts. Tr. at 59–60. She said she could not watch television for more than 10 or 15 minutes before becoming distracted and going into her "own little world." Tr. at 60. Plaintiff said she could do some chores like wash dishes for 15 minutes at a time before it became too much. *Id.* She said she did not think she could work full time like she did at Parkway Products, where counted refrigerator parts to put into boxes, because her thoughts would not permit her. Tr. at 61. She said she could count up to 15 before becoming distracted. *Id.*

Plaintiff said she had pain in her fallen arches and hips. Tr. at 63. She said she could care for her own hygiene, cook, wash dishes by hand, vacuum, sweep, and do her own laundry, but would forget it sometimes. Tr. at 63–64.

### b. Vocational Expert Testimony

Vocational Expert ("VE") Jesse Ogren reviewed the record and testified at the hearing. Tr. at 64–69. The VE categorized Plaintiff's PRW as a packager, medium, unskilled, specific vocational preparation ("SVP") of 2, *Dictionary of Occupational Titles* ("*DOT*") number 920.587-018. Tr. at 65.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform a full range of light work, except occasionally push and pull foot controls with both feet; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolding; occasionally kneel, crouch, and crawl;

never be exposed to extreme cold; never be exposed to vibration; never be exposed to unprotected heights or hazardous moving mechanical parts; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace; limited to simple work-related decisions; could occasionally interact with supervisors and coworkers; could never interact with the public; and could tolerate no more than ordinary and routine changes in work setting and duties. Tr. at 66. The VE testified the individual could not perform Plaintiff's PRW, but could perform the following jobs: (1) housekeeping, light, unskilled, SVP of 2, *DOT* number 323.687-014; (2) labeler, light, unskilled, SVP of 2, *DOT* number 920.587-014; and (3) garment bagger, light, unskilled, SVP of 1, *DOT* number 920.687-018, with 90,000, 500,000, and 140,000 positions available nationally, respectively. Tr. at 66–67.

The ALJ provided a second hypothetical that modified the first to limit the individual to the full range of sedentary work. Tr. at 67. The VE testified the individual could not perform Plaintiff's PRW, but could perform the following sedentary jobs: (1) polisher, SVP of 2, *DOT* number 713.684-038; (2) cuff folder, SVP of 2, *DOT* number 685.687-014; and (3) laminator, SVP of 2, *DOT* number 690.685-258, with 96,000, 31,000, and 85,000 positions available nationally, respectively. Tr. at 66–67. The VE testified the positions would remain available to an individual who was limited to interacting with

coworkers on no more than an occasional and superficial basis. Tr. at 67–68.

The VE testified that if the individual were off-task for a minimum of 20% of

the time and absent a minimum of three days per month, she would be

unable to perform any work. Tr. at 68.

Plaintiff's counsel asked whether performing the packager position is

consistent with an individual with an IQ of 68, and the VE testified the

position was entry-level, production-style, and not complex. Tr. at 69.

2.      The ALJ's Findings

In his decision, the ALJ made the following findings of fact and

conclusions of law:

1.      The claimant meets the insured status requirements of the Social
        Security Act through December 31, 2017.
2.      The claimant has not engaged in substantial gainful activity
        since September 1, 2012, the alleged onset date (20 CFR 404.1571
        *et seq.*, and 416.971 *et seq.*).
3.      The claimant has the following severe impairments: ankle
        disorders (bilateral); hip disorders (bilateral); immune system
        disorders (rheumatoid arthritis); knee impairments (left knee);
        lumbar spine disorders; weight disorders (obesity); affective,
        anxiety, and intellectual disorders (20 CFR 404.1520(c) and
        416.920(c)).
4.      The claimant does not have an impairment or combination of
        impairments that meets or medically equals the severity of one of
        the listed impairments in 20 CFR Part 404, Subpart P, Appendix
        1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925
        and 416.926).
5.      After careful consideration of the entire record, the undersigned
        finds that the claimant has the residual functional capacity to
        perform light work as defined in 20 CFR 404.1567(b) and
        416.967(b) except: occasionally push and/or pull foot controls with
        both feet (bilaterally); frequently climb ramps or stairs; never
        climb ladders, ropes or scaffolds; occasionally kneel, crouch, or

crawl; never be exposed to extreme cold; never be exposed to vibration; never be exposed to unprotected heights or hazardous moving mechanical parts; limited to performing simple routine and repetitive tasks, but not at a production rate pace; limited to simple work-related decisions; occasionally interact with supervisors and coworkers, but have no interaction with the public; and capable of tolerating no more than ordinary and routine changes in work setting and duties.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on January 7, 1967 and was 45 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 20–33.

II.  Discussion

Plaintiff alleges the evidence shows her impairments render her unable to engage in any substantial gainful activity. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4)

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[7] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982).

---

C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[7] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson*

*v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

On September 27, 2019, Plaintiff's attorney filed a motion to withdraw in accordance with Local Civ. R. 83.I.07(b). [ECF No. 12]. On October 18, 2019, the court issued an order granting Plaintiff's attorney's motion to

withdraw and directing Plaintiff to advise the court in writing by November 7, 2019, as to the identity of new counsel or whether she intended to proceed pro se or to voluntarily dismiss the action. [ECF No. 15]. Plaintiff failed to respond to the court's order. She subsequently declined to respond to an October 24, 2019 order directing her to file a brief by November 25, 2019, and warning that failure to file the brief may result in the case being recommended for dismissal with prejudice for failure to prosecute or a ruling on the record. [ECF No. 23]. Given Plaintiff's failure to respond to the court's orders and to file a brief, the undersigned has considered whether the ALJ's decision is supported by substantial evidence and adequately explained as directed in the regulations and by Fourth Circuit precedent, without regard to any specific allegations of error.

The Commissioner argues substantial evidence supports the ALJ's RFC assessment and finding that Plaintiff was not disabled within the meaning of the Social Security Act. [ECF No. 34 at 1, 5–11]. He maintains the ALJ considered all the relevant evidence, including imaging studies and other objective medical evidence, the medical opinions of record, and Plaintiff's subjective allegations and ADLs. *Id.* at 6–11.

A claimant's RFC must be based on all the relevant evidence and should account for all of her medically-determinable impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). "'An ALJ has the obligation to consider all

relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.'" *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). The RFC assessment must include a narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019).

If the claimant has a condition that could reasonably produce the symptoms she alleges, the ALJ "must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. § 404.1529(c)). In evaluating alleged symptoms, the ALJ is to "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. "Other evidence that [the ALJ should] consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." *Id.* at *5; *see*

*also* 20 C.F.R. § 404.1529(c)(3) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; treatment an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

The ALJ must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ determined Plaintiff had the RFC to perform a range of work at the light exertional level with additional postural, environmental, and mental restrictions. Tr. at 24–25. In assessing Plaintiff's RFC, the ALJ acknowledged Plaintiff's allegations that her impairments "were debilitating," "limited her ability to work," "restricted her physical functioning" such that she had difficulty squatting, "affected her memory" such that she required reminders, "prevented her from understanding and

completing tasks," experienced difficulty breathing as a result of anxiety, and felt "physical pain in her hips and feet, particularly when she walk[ed]" that elevated her pain level to "a seven or eight out of 10." Tr. at 25. Although the ALJ found Plaintiff's impairments could reasonably be expected to cause the symptoms she alleged, he concluded they were "to a certain extent inconsistent with the medical evidence and other evidence in the record." Tr. at 25–26.

The ALJ discussed objective evidence of rheumatoid and osteoarthritis, citing imaging studies and examination findings of tenderness of the ankles, observation of shuffling gait, and limited ROM during some treatment visits. Tr. at 26. However, he further noted imaging studies of the lumbar spine showed well-maintained disc heights and left hip x-rays showed a maintained hip joint. *Id.* He indicated Plaintiff had non-tender knees with full ROM to flexion and extension, full ROM of the hips, and full strength in her upper and lower extremities during the orthopedic consultative exam. *Id.* He stated "physical examination results during treatment visits generally reveal[ed] normal range of motion of the back, and normal range of motion of the upper and lower extremities and hips." Tr. at 26–27. He noted Plaintiff ambulated without an assistive device. Tr. at 27. He explained he restricted Plaintiff "from medium and heavy work demands" and imposed some postural restrictions because the record supported some limitations, but did not

suggest she was "prohibited from all physical activity." *Id.* He specifically stated he had considered Plaintiff's pain in limiting her to occasionally pushing and/or pulling foot controls with the bilateral feet. *Id.* He indicated he had also incorporated environmental restrictions precluding exposure to extreme cold or vibration to address Plaintiff's "rheumatoid arthritis and documented back, joint and lower extremity pain, with her obesity as an aggravating factor." Tr. at 29.

The ALJ explained that he had not imposed greater physical limitations based on Plaintiff's allegations of pain because her ADLs showed she could "perform a wide variety of physical activities and attend to most, if not all, aspects of her personal care needs." Tr. at 27. He acknowledged Plaintiff's report that she had some difficulty bathing and had to hold on to the handrail for support. *Id.* However, he noted Plaintiff could "cook simple meals, do the dishes, shop in stores for groceries and 'house needs,' as well as drive and watch television—indicating her ability to walk, stand, and perform postural actions to some extent, despite her averments." *Id.* Although the ALJ declined to assess seizure disorder as a severe impairment at step two, he explained he had accounted for Plaintiff's reported seizures by limiting her to light work with postural restrictions and "incorporat[ing] workplace safeguards," including provisions that she should "never be exposed to unprotected heights or hazardous moving mechanical part[s]" and

limiting her climbing activities "such that she [could] never climb ladders, ropes, or scaffolds" and could "only frequently climb ramps or stairs." *Id.*

In assessing the mental component of the RFC, the ALJ explained he had considered Plaintiff's "history of special education, insomnia and sleep disturbance, reports regarding her issues with recalling information, anxiety and panic regarding social interaction like shopping," finding this evidence "to some degree consistent with the medical evidence of record." Tr. at 28. However, he indicated "the longitudinal record also demonstrates that the claimant has: no psychotic symptoms, no hallucinations, no paranoia, delusions, or homicidal or suicidal ideation and often presents as cooperative, well oriented and having good judgment when seen regularly by medical professionals, and as assessed by psychological consultative examiners of record." *Id.* He stated "[d]emonstrative of her [ability to adapt and manage herself] is the claimant's capacity to monitor her mental condition and commit to improved mental health through counseling with treatment records reporting the claimant has 'self-management abilities.'" *Id.*

The ALJ had previously discussed Plaintiff's mental impairments and limitations in greater detail at step three, rejecting the argument that her impairment met Listing 12.05 because the evidence did not support significant deficits in adaptive functioning and she did not have extreme limitation of one or marked limitation of two of the four areas of mental

functioning. *See* Tr. at 22, 23. He acknowledged evidence of below average IQ, a history of speech therapy, and limitations in memory and general academic abilities, but concluded Plaintiff's mental health records showed she had "the ability to understand and acknowledge matters inclusive of her condition and treatment" and was "able to follow some instructions on more than an occasional basis." Tr. at 22–23. He noted mental exams generally showed Plaintiff to have intact memory, to be capable of performing simple math calculations, and to present "with normal, appropriate, coherent, and relevant speech." Tr. at 23. He concluded Plaintiff's moderate limitation in understanding, remembering, or applying information limited her to "understanding and applying information for the performance of simple routine and repetitive tasks." *Id.*

The ALJ acknowledged Plaintiff retained social skills "to spend time with others and socialize via telephone," but also recognized her claim of having panic attacks in public. *Id.* He assessed a marked degree of limitation in interacting with others, concluding Plaintiff was "more comfortable and thus would perform better in more socially isolated settings" and restricting her to "occasional interaction with supervisors and coworkers," but "no interaction with the public." *Id.*

The ALJ assessed a mild degree of limitation in concentrating, persisting, or maintaining pace, noting treatment records and self-reported

activities that "indicated [Plaintiff] could sustain focused attention sufficiently long to permit the timely and appropriate completion of tasks commonly found in routine and repetitive, but not detailed or complex, work settings." *Id.* He acknowledged that Plaintiff's medications and insomnia, as well as "her academic background to include special education, symptoms of depression, panic and anxiety" could "reasonably impact her ability to concentrate and maintain pace." *Id.* He concluded Plaintiff was "limited to performing simple routine and repetitive tasks, provided that, such tasks are not at a production rate pace." *Id.*

The ALJ found Plaintiff had a mild degree of limitation as to adapting or managing herself. *Id.* He acknowledged Plaintiff's self-reported difficulty in handling stress, as well as her indication that she could handle changes in routine "okay." *Id.* He noted the record lacked evidence to suggest Plaintiff had difficulty managing her personal finances or attending to her personal care and hygiene. Tr. at 23–24. He recognized Plaintiff had never lived alone, but pointed out she was "able to go out on her own, manage money by paying bills, counting change, handling a savings account, using a check book and money orders, and can go grocery shopping in stores." Tr. at 24. He stated treatment visits typically showed her to present "as well oriented, cooperative, with appropriate [a]ffect, despite euthymic or depressed mood, noting she was assessed as having a 'very concrete' thought process and

'usually able to make good decisions.'" *Id.* The ALJ determined Plaintiff's mild limitation in adapting or managing herself translated to a restriction in the RFC "to tolerating no more than ordinary and routine changes in work setting and duties" and a limitation "to simple work-related decisions." *Id.*

The ALJ specified he had considered Plaintiff's medications in assessing her RFC. *Id.* He explained he "considered environmental hazards and incorporated reasonable safety precautions" to account for potential side effects. Tr. at 28–29.

The ALJ weighed and explained the weight he accorded to the medical opinions of record. Tr. at 29–31. He gave "some weight" to the opinions of the state agency reviewing consultants, finding they "gave good summaries of the medical evidence of record at the time of their respective opinions." Tr. at 29. He found Drs. Jackson's and Williams's opinions that Plaintiff had an affective disorder were supported by the record, but that further restrictions were warranted given evidence of intellectual disorder and the totality of the evidence indicating severe mental impairments. *Id.* He found Drs. Taylor's and Collins's opinions "consistent with the longitudinal record, noting the claimant's gait disturbance and poor balance," but found that greater restrictions were warranted in light of subsequent evidence showing that obesity and lumbar, knee, and ankle conditions greater restricted Plaintiff's ability to function. Tr. at 29–30. He accorded "some weight" to Dr. Moody's

opinion, finding she was "able to clearly opine that the claimant had some limitations in her social functioning and ability to concentrate as is consistent with the total record evidence, but noting her impression that test results were "questionable" given Plaintiff's "contradictory statements, confusion in reporting, inconsistent effort, and possible indications of malingering." Tr. at 30. The ALJ gave Dr. DePace's opinion "some weight," finding his "assessment as to the claimant's low average intellectual functioning consistent with a history of special education and examination findings that she can perform simple mathematical calculations" and supportive of a finding that Plaintiff "is limited to simple decision making and the performance of simple, routine, repetitive tasks." *Id.* The ALJ accorded "some weight" to opinions from Drs. Hynes and Ford, finding "their examination results mutually consistent and consistent with the claimant's treatment record, noting lower extremity pain, back pain, and hip pain." Tr. at 30–31. He acknowledged that neither Dr. Hynes nor Dr. Ford provided specific limitations, but found their examination findings "persuasive in formulating the [RFC]," as postural and workplace restrictions were supported by their observations of limited ROM, lower extremity pain, and back pain with obesity as an exacerbating factor. Tr. at 31. Finally, the ALJ gave "some weight to Counselor Gibson's opinion," noting she was Plaintiff's "mental health therapist" and had a "close relationship with the claimant." *Id.* He

considered Counselor Gibson's opinion as to Plaintiff's "symptoms and difficulty socializing" in the mental component of the RFC assessment, but rejected her opinion that "it was unlikely" Plaintiff "could 'maintain gainful employment for the foreseeable future,'" because such issues are reserved to the Commissioner. *Id.*

Although the record arguably contains some evidence to suggest Plaintiff was more limited than the ALJ found her to be, the court finds the ALJ considered and accounted for all the relevant evidence in assessing Plaintiff's RFC in accordance with 20 C.F.R. § 404.1545(a) and § 416.945(a) and SSR 96-8p. The ALJ evaluated Plaintiff's allegations as to the limitations her impairments imposed, but reasonably concluded her allegations were not fully supported by the record based on some her statements and self-reported abilities, imaging results, objective findings, her medical providers' impressions, and her ADLs. *See generally* Tr. at 22–31. He addressed and resolved conflicting evidence, providing a logical explanation for the restrictions he found. Therefore, his decision is supported by substantial evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a

matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

Shiva V. Hodges

February 27, 2020
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge